**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- x

ERNESTINE GRANT and MARJORIE : 
WALKER, on behalf of themselves individually :
and on behalf of all similarly situated persons, :     Civil Action No.
                                                :
              Plaintiffs,                       :
                                                :     **CLASS AND COLLECTIVE**
      v.                                        :     **ACTION COMPLAINT**
                                                :
THE NEW YORK TIMES COMPANY, MARK :
THOMPSON, in his individual and professional :        **Jury Trial Demanded**
capacities, and MEREDITH LEVIEN, in her :
individual and professional capacities,         :
                                                :
              Defendants.                       :
------------------------------------------------------------------- x

     Plaintiffs Ernestine Grant and Marjorie Walker (together, "Plaintiffs"), on behalf of

themselves and all similarly situated persons, through undersigned counsel, Wigdor LLP, as and

for their Complaint against The New York Times Company (the "Times" or the "Company"),

Mark Thompson and Meredith Levien (together "Defendants"), hereby allege:

## NATURE OF THE CLAIMS

     1.     The New York Times, widely touted as the "paper of record," has been engaging

in deplorable discrimination that has remained largely off the record. Unbeknownst to the world

at large, not only does the Times have an ideal customer (young, white, wealthy), but also an

ideal staffer (young, white, unencumbered with a family) to draw that purported ideal customer.

In furtherance of these discriminatory goals, the Times has created a workplace rife with

disparities. Unfortunately, the Times's Advertising staff on the business side is systematically

becoming increasingly younger and whiter. Plaintiffs Grant and Walker (together, "Class

Representatives") are employed in the Advertising division at the Times and have experienced

discrimination, and were retaliated against, when they complained about such discrimination.

1

2.        Beginning with the appointment of Defendant Mark Thompson to Chief

Executive Officer ("CEO") in 2012, the workplace at the Times has become an environment rife

with discrimination based on age, race, and gender.

3.        Mr. Thompson's appointment was riddled with controversy, given the numerous

humiliations and indignities he presided over during his tumultuous tenure as the Director-

General of the British Broadcasting Corporation ("BBC").   As described in more detail below:

- Mr. Thompson was involved in a highly publicized BBC scandal
  regarding a decision to bury an exposé of child sex abuse allegedly
  committed by one the BBC's most well-known personalities, Jimmy
  Savile.[1]  Not only was Mr. Thompson seemingly involved in attempting to
  conceal this important piece of journalism from the public, but he also
  later lied about his role in the affair, which was demonstrated through an
  irrefutable recording.[2]

- Following a slew of allegations of age and gender discrimination at the
  BBC, Mr. Thompson *admitted* that during his tenure, the BBC had
  problems with the way it treated older women.[3]

- Mr. Thompson was publicly reported to engage in utterly bizarre and
  highly unprofessional behavior, such as when he bit the arm of a
  subordinate employee.  Mr. Thompson admitted to the incident, and
  claimed it was merely "horseplay," but the victim explained it as
  completely unprovoked and unusual.[4]

4.        Indeed, editors and columnists for the Times called into question the hiring

decision.  The New York Times's then-Public Editor Margaret Sullivan – charged with

---

[1]        *See, e.g.*, CNN Wire Staff, "Former BBC Chief Explains Dropped Savile Investigation,"
CNN WORLD, Oct. 25, 2012, *available at* http://www.cnn.com/2012/10/24/world/europe/uk-
savile-scandal/.

[2]        *See, e.g.*, Ben Webster, "Reporter Counters Mark Thompson's Claim He Knew Nothing
of Savile Sex Abuse," THE TIMES, Oct. 24, 2012, *available at*
http://www.thetimes.co.uk/tto/news/medianews/article3577578.ece.

[3]        *See, e.g.*, Mimi Turner, "BBC Boss Mark Thompson Admits 'BBC Got It Wrong' on
Older Women," THE HOLLYWOOD REPORTER, Feb. 9. 2012, *available at*
http://www.hollywoodreporter.com/news/bbc-boss-mark-thompson-admits-288453.

[4]        Richard Kay, "The Day I Was Bitten by BBC Boss," THE STANDARD, Mar. 24, 2005,
*available at* http://www.standard.co.uk/news/the-day-i-was-bitten-by-bbc-boss-7086208.html.

independently and critically examining the paper's journalistic standards – questioned his integrity, decision-making and suitability for the job.[5]  Moreover, New York Times columnist Joe Nocera, who also questioned the appointment of Mr. Thompson as CEO, stated that Mr. Thompson's involvement in the Savile scandal was "worrisome" and made him look "willfully ignorant."[6]

5.      Outsiders also questioned Mr. Thompson's integrity, including well-regarded journalist David Folkenflik, who in reporting on the Jimmy Savile scandal, wrote that the revelations amounted to:

> [A] troubling episode for anyone in leadership of the BBC, one of the great journalistic institutions not just to the UK but of the world. And it's troubling too for Thompson, who was at the top of the BBC pyramid when the Newsnight decision was made, and now will be leading one of the world's other great media institutions – the New York Times.[7]

6.      In addition to his reputation for questionable ethics, Mr. Thompson was nothing short of an abusive supervisor.  When Mr. Thompson was the newly appointed editor of the Nine O'Clock News, he supervised Anthony Massey, who once approached Mr. Thompson to discuss a pending story.  It was reported that before Mr. Massey could say a word, Mr. Thompson "suddenly **turned, snarled, and sank his teeth** into [Mr. Massey's] left upper arm (leaving marks through the shirt, but not drawing blood)."

---

[5]      Margaret Sullivan, "Times Must Aggressively Cover Mark Thompson's Role in BBC's Troubles," NY TIMES, Oct. 23, 2012, *available at* http://publiceditor.blogs.nytimes.com/2012/10/23/times-must-aggressively-cover-mark-thompsons-role-in-bbcs-troubles/.

[6]      Joe Nocera, Op-Ed., "The Right Man For the Job?," NY TIMES, Oct. 29, 2012, at A27.

[7]      Ed Pilkington, "New York Times Chief Mark Thompson Leaves Sex Abuse Scandal at BBC," THE GUARDIAN, Oct. 16, 2010, *available at* http://www.theguardian.com/media/2012/oct/16/new-york-times-mark-thompson-jimmy-savile-bbc.

7.      Mr. Massey reported: "I pulled my arm out of his jaws, like a stick out of the jaws of a labrador.  The key thing is, we didn't have a row first, or even speak, and I had never had any dispute with him."  When Mr. Massey relayed this incident to a colleague, the colleague responded: "The bloke [referring to Mr. Thompson] is **quite clearly insane**."[8]

8.      Unfortunately, the decision to hire a CEO embroiled in ethical and business controversies is part of a pattern of discrimination-oriented decision-making at the New York Times and the logical and expected result of a Company dominated by male leadership.  At the New York Times, only four of the fourteen members of the Board of Directors are women,[9] and of the ten members of the Company's Executive Committee, Defendant Meredith Levien is the only woman.[10]  This lack of female leadership fosters an atmosphere where gender roles, stereotypes and biases are reinforced, and where strong female voices are considered "pushy" and "difficult," rather than "ambitious," "assertive" or "aggressive."

9.      In 2012, it was widely reported that then-CEO Janet Robinson was pushed out without a replacement even lined up, in part because Chairman and Publisher Arthur O. Sulzberger Jr.'s then-girlfriend, Claudia Gonzalez, simply did not like Ms. Robinson.[11]  It has never been reported that any male executive has been terminated or that any other high-level personnel decisions have been influenced by Mr. Sulzberger's love interests.

---

[8]      Richard Kay, "The Day I Was Bitten by BBC Boss," THE STANDARD, Mar. 24, 2005, *available at* http://www.standard.co.uk/news/the-day-i-was-bitten-by-bbc-boss-7086208.html (emphasis added).

[9]      The New York Times, "Board of Directors," NEW YORK TIMES, *available at* http://www.nytco.com/board-of-directors/.

[10]      The New York Times, "Executive Team," NEW YORK TIMES, *available at* http://www.nytco.com/executives/.

[11]      *See, e.g.*, Joe Hagan, "A New York *Times* Whodunit," NY MAG, May 26, 2012, *available at* http://nymag.com/news/features/new-york-times-2012-6/.

10.     In 2014, it was widely reported that Jill Abramson, the New York Times's first female Executive Editor, was fired only after she complained that she was being paid less than her male peers and predecessors.[12]  The New York Times's top brass has stated that she was fired based on undescribed disagreements with management, though reports have emerged that Ms. Abramson was described as "pushy" or "brusque" – pejorative terms commonly used to denigrate strong women.[13]  Ms. Abramson was replaced by a man, Dean Baquet.  Since then, Ms. Abramson has been hailed as a feminist champion, standing up to the male establishment at the New York Times.

11.     Gender inequality is so endemic at the New York Times that Ms. Abramson, its first female Executive Editor, was unable to turn around the troubling realities of the newsroom. The New York Times's male-dominated atmosphere stereotypes women and pigeonholes them into roles that are perceived to be in their interest.  This was highlighted in a 2014 Women's Media Center study, which showed that the New York Times had the largest gender gap of any of the top 10 most widely circulated newspapers, with approximately 69% of the bylines belonging to men, 75% of the opinion writers being men, and with female reporters being far less likely to cover hard news content and far more likely to cover lighter lifestyle topics.  Moreover, the study found that New York Times reporters were approximately 3.5 times more likely to use male sources as opposed to female sources.

---

[12]     *See, e.g.*, Ken Auletta, "Why Jill Abramson Was Fired: Part Three," THE NEW YORKER, May 18, 2014, *available at* http://www.newyorker.com/business/currency/why-jill-abramson-was-fired-part-three.

[13]     *See, e.g.*, Ruchika Tulshyan, "Did the NY Times Fire Jill Abramson For Being 'Bossy'?," FORBES, May 14, 2014, *available at* http://www.forbes.com/sites/ruchikatulshyan/2014/05/14/did-the-ny-times-fire-jill-abramson-for-being-pushy/.

12.    In light of the institutional gender inequality at the New York Times, it is not surprising that the New York Times not only overlooked and disregarded Mr. Thompson's record on journalistic ethics and integrity, but also ignored that he endorsed and perpetuated a system of gender discrimination while at the helm of the BBC.  During his tenure, a slew of women complained about sexist and ageist employment practices:

- Moira Stuart, a 58-year-old black female veteran newsreader, announced that she was leaving the corporation after a 30-year career at the BBC. Her decision came merely six months after losing her Sunday morning slot on Sunday AM, sparking allegations that age discrimination drove her departure.[14]

- In November 2008, four female BBC presenters of the BBC One show "Countryfile," Michaela Strachan, Charlotte Smith, Miriam O'Reilly and Juliet Morris, all in their 40's and 50's, were dismissed from the program while male hosts John Craven and Adam Henson were kept on.[15]

- Miriam O'Reilly, one of the terminated "Countryfile" presenters, claimed she was "warned about wrinkles."  She filed an age discrimination suit and won a payout against the BBC.[16]

- In July 2009, then 66-year-old Arlene Phillips, a former theater choreographer, was replaced on the "Strictly Come Dancing" panel by Alesha Dixon, a 30-year-old pop star.  The male judges, whose ages ranged from 44 to 81, were all retained.[17]

13.    Those who claimed they had been discriminated against on Mr. Thompson's watch stated, among many other problems, that: "There has long been a black joke at the BBC

---

[14]    Nicole Martin, "Moira Stuart Quits, Reigniting Ageism Row," THE TELEGRAPH, Oct. 3, 2007, *available at* http://www.telegraph.co.uk/news/uknews/1564966/Moira-Stuart-quits-reigniting-BBC-ageism-row.html.

[15]    Leigh Holmwood, "Countryfile Peak-Time Move Sparks Ageism Row," THE GUARDIAN, Nov. 28 2008, *available at* http://www.theguardian.com/media/2008/nov/28/countryfile-bbc.

[16]    BBC News, "Countryfile Presenter Suing BBC 'Warned About Wrinkles,'" BBC NEWS, Nov. 4, 2010, http://www.bbc.com/news/entertainment-arts-11696591.

[17]    Leigh Holmwood, "Strictly Ageism? Row as Arlene Phillips, 66, Is Axed for a 30-Year-Old," THE GUARDIAN, Jul. 17, 2009, *available at* http://www.theguardian.com/media/2009/jul/17/arlene-phillips-strictly-come-dancing.

that when a woman's age exceeds her bra size, she is finished,"[18] "They wanted [to] send me away on a posting which meant I'd have been separated from my baby at a time when I was breast-feeding,"[19] and "The BBC has a reputation of being a respectable organization, but it doesn't seem to have any room for working mothers."[20]

14.     Ultimately, in the face of a barrage of women claiming discrimination at the BBC, Mr. Thompson acknowledged that these incidents had served as a "wake up call," and admitted that his company had an institutional problem regarding the treatment of senior and experienced women:

> **"Let's not mince words.  Those who say the BBC has a case to answer about the way it treats older women on the air are right – we do . . . There are manifestly too few older women broadcasters on the BBC."**[21]

15.     Journalist Selina Scott wrote of Mr. Thompson's response:

> "It pains me to say this about my old friend Mark, but hypocrisy wafts from almost every word of his mea culpa.  He has been in power long enough to detoxify the BBC's misogynist attitude towards women of a certain age but instead presided over an almost Masonic male-dominated club."[22]

---

[18]     Selina Scott, "More Wrinklies Like Me on the BBC? I Won't Hold My Breath, Mr. Thompson," DAILY MAIL, Feb. 9, 2012, *available at* http://www.dailymail.co.uk/femail/article-2099138/BBCs-Mark-Thompson-view-women-Selina-Scott-delivers-blistering-riposte.html.
[19]     Jonathan Wynne-Jones, "BBC Faces Fresh Claims of Sexism and Ageism," THE TELEGRAPH, Apr. 8, 2012, *available at* http://www.telegraph.co.uk/culture/tvandradio/bbc/9192152/BBC-faces-fresh-claims-of-sexism-and-ageism.html.
[20]     *Id.*
[21]     Mimi Turner, "BBC Boss Mark Thompson Admits 'BBC Got It Wrong' on Older Women," THE HOLLYWOOD REPORTER, Feb. 9, 2010, *available at* http://www.hollywoodreporter.com/news/bbc-boss-mark-thompson-admits-288453  (emphasis added).
[22]     Selina Scott, "More Wrinklies Like Me on the BBC? I Won't Hold My Breath, Mr. Thompson," DAILY MAIL, Feb. 9, 2010, *available at* http://www.dailymail.co.uk/femail/article-2099138/BBCs-Mark-Thompson-view-women-Selina-Scott-delivers-blistering-riposte.html.

16.     Unfortunately, after leaving his post at the BBC just ahead of the eruption of the Jimmy Savile scandal, Mr. Thompson somehow was hired as CEO for the New York Times and brought his misogynistic and ageist attitudes across the Atlantic to New York City.

17.     Shortly after his arrival at the New York Times, Mr. Thompson used his sway as CEO to hire in and reward managers who would carry out his vision of the ideal workforce.

18.     Mr. Thompson's first major appointment of a business-side executive was Defendant Meredith Levien, who assumed a newly created role, Chief Revenue Officer.

19.     At the beginning of her tenure at the Times in 2013, Ms. Levien made it very clear that she was looking for a very particular workforce, one that was filled with "fresh faces," i.e., younger employees without families, and who were white.  Ms. Levien's speech to various Times personnel also was shockingly rife with racially charged innuendos, such as references to the need for employees to be "people who look like the people we are selling to" and even going so far as to say "this isn't what our sales team should look like."  Ms. Levien's remarks gave cover to and outright endorsed increasing disparate treatment against older, female and/or non-white employees in the Advertising division.

20.     True to form, under Mr. Thompson and Ms. Levien, age, gender and race discrimination became a modus operandi at the Times, with two different age- and-gender related lawsuits filed by female advertising executives over the last year.[23]

21.     Tracy Quitasol, a 51-year-old Asian-American woman and Executive Director who worked at the Times for nine years, alleged in her federal discrimination complaint against the Times that soon after Ms. Levien became her supervisor, the "vast majority" of the around 30

---

[23]     *Quitasol v. New York Times Co. and Meredith Levien*, No. 15 Civ. 4873 (DAB) (S.D.N.Y. filed June 23, 2015); *Davies v. The New York Times Co.*, No. 16 Civ. 1132 (AJN) (S.D.N.Y. filed February 15, 2016).

older (and generally racial/ethnic minority) employees were targeted by Ms. Levien as not looking "like the people we are selling to," were "packaged out" of the Times in short order, and replaced with white employees under the age of 40.

22.     Likewise, Arielle Davies, a Director in the Advertising division of the Times, also came under the supervision of Defendant Levien in or around August 2013.  Ms. Levien, according to Ms. Davies's federal discrimination complaint, in her first conversation with Ms. Davies, asked whether Ms. Davies had children and, upon learning that Ms. Davies did not, remarked, "Good, you should wait.  That's what I did.  Focus on your career."  Ms. Davies further alleged that about a year later, when she told Ms. Levien that she was pregnant, Ms. Levien immediately asked her how much time away from work she would be taking and, on being told four months, remarked in a dismayed tone, "Wow, you're taking the full four months?"  After Ms. Davies reportedly encountered further resistance from management to the idea of her returning to work while working from home one day a week, she was terminated purportedly in connection with a reduction-in-force (she was the only employee in her department affected) just one week before she was due to return from her leave.

23.     Incredibly, Ms. Levien has been incentivized for her actions, with both a promotion to Executive Vice President, and a compensation package totaling $1.8 million.  Mr. Thompson has similarly been rewarded; his salary has doubled over his tenure to nearly $8.7 million.[24]

---

[24]     Alexandra Steigrad, "The New York Times Reveals Pay for Top Executives; CEO Mark Thompson Gets a Raise," WOMEN'S WEAR DAILY, March 22, 2016, *available at* http://wwd.com/media-news/fashion-memopad/the-new-york-times-reveals-pay-compensation-2015-top-execs-ceo-mark-thompson-arthur-sulzberger-10396303/.

24.     This class action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including unlawful discrimination, against Plaintiffs in violation of 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, New York City Administrative Code §§ 8-101 *et seq*. ("NYCHRL"), the Equal Pay Act of 1963, 29 U. S. C. § 206(d) ("EPA"), and the New York Equal Pay Law, New York Labor Law § 194  ("EPL").

25.     As set forth below, Plaintiffs and classes of similarly situated older, Black and/or female current and former employees of the Times are victims of discriminatory barriers to equal opportunity advancement, which has included the unlawful denial of promotions, compensation commensurate with younger white employees, and equality with respect to the terms and conditions of their employment, including, in many cases, the termination of such employment.

26.     The Times's compensation, assignment and promotion policies, practices and/or procedures incorporate the following discriminatory practices: (a) failing to compensate older, Black and/or female employees the same as similarly situated younger, white and/or male employees; (b) failing to promote older, Black and/or female employees at the same rate and on the same terms and conditions as similarly situated younger, white and/or male employees; (c) relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of racial-, age- and/or gender-based stereotypes and bias by the Times's predominantly white managerial and supervisory staff in making compensation, assignment, promotion and termination decisions; (d) generally refusing to provide equal terms and conditions of employment for older, Black, and/or female employees; and (e) selecting and

accepting older, Black and/or female employees for "buyouts" as part of Company-wide layoffs at rates that are statistically unlikely to have occurred by chance.

## ADMINISTRATIVE PROCEDURES

27.     Plaintiffs will be filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and will file an Amended Complaint alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA") following the EEOC's issuance of a Notice of Right to Sue.

28.     After commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

29.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

30.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981 and the Equal Pay Act.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

31.     Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

**PLAINTIFFS AND CLASS REPRESENTATIVES**

32.     Plaintiff Ernestine Grant is a 62-year-old Black female employee of The New York Times Company, and has been employed at the Times for the past sixteen years.  She is a resident of the State of New York, and at all relevant times met the definition of an "employee" or "eligible employee" under all applicable statutes.

33.     Plaintiff Marjorie Walker is a 61-year-old Black female employee of The New York Times Company, and has been employed at the Times for the past eight years.  She is a resident of the State of New York, and at all relevant times met the definition of an "employee" or "eligible employee" under all applicable statutes.

**DEFENDANTS**

34.     Defendant The New York Times Company is a domestic business corporation with its principal place of business at 620 Eighth Avenue, New York, New York 10018.  At all relevant times, Defendant New York Times met the definition of an "employer" under all relevant statutes.

35.     Defendant Mark Thompson is a resident of the State of New York and the President and CEO of Defendant New York Times, controlling its operations and determining its policies and practices.  At all relevant times, Defendant Thompson met the definition of "employer" under all relevant statutes (*i.e.*, § 1981, the NYSHRL and NYCHRL, and any other statues providing for individual liability).

36.     Defendant Meredith Levien is a resident of the State of New York and the Executive Vice President and Chief Revenue Officer of Defendant New York Times.  At all relevant times, Defendant Levien met the definition of an "employer" under all relevant statutes

(*i.e.*, § 1981, the NYSHRL and NYCHRL, and any other statues providing for individual liability).

## FACTUAL ALLEGATIONS

37.     The Times, on its website, states a goal of "having a staff as wide as it is deep, broad in perspective, backgrounds and experiences . . . to capture the multitude of voices of America and the world, with true fidelity."

38.     Recently, diversity has been subverted at every turn throughout the organization, and in particular on the business side in the Advertising division.

39.     In 2011, the Times terminated Janet Robinson as CEO.  She was replaced with Defendant Mark Thompson, a candidate riddled with problems involving ethics scandals, poor decision-making and a record of gender and age discrimination at the BBC.

40.     At the time, Mr. Thompson was Director-General of the BBC, where he was embroiled in a scandal that saw the media organization squash an important piece of investigative journalism.  That piece would have revealed one of the network's most well-known former personalities, Jimmy Savile, to be a serial pedophile.

41.     In or around December 2011, the BBC's show "Newsnight" was going to run the story when the piece was suddenly cancelled.  Incredibly, around the same time, the BBC ran numerous tributes to Mr. Savile and his contributions to the network.

42.     When the cancellation of the program became known, in or around October 2012, all eyes looked to Mr. Thompson to determine whether he had played a role.

43.     Mr. Thompson initially denied any awareness of the underlying allegations or of the "Newsnight" cancelation while he was at the BBC.  Later, however, reports indicated that he was aware of the "Newsnight" investigation, well before the cancelation.

13

44. As a result, Mr. Thompson changed his story, acknowledging that he was told about an investigation, but maintained his lack of awareness of any details involving sexual abuse. However, this version of events was then undone by the surfacing of an audio recording in which he admitted awareness that the investigation involved "sexual abuse of some kind."

45. In fact, it became known that Mr. Thompson was so sensitive to his alleged involvement becoming public that he had his lawyers send a letter to the BBC threatening to sue the network if any stories regarding his involvement in the suppression were released.

46. Mr. Thompson's inconsistent statements led the then-New York Times's Public Editor, Margaret Sullivan, to question his appointment to the CEO helm. Ms. Sullivan stated that Defendant Thompson's:

> "**integrity and decision-making are *bound* to affect the Times and its journalism – profoundly**. It's worth considering now whether he is the right person for the job, given this turn of events."

47. New York Times columnist Joe Nocera questioned the Mr. Thompson hire in his own column, saying:

> "Thompson winds up appearing **willfully ignorant**, and it makes you wonder . . . what kind of leader he was. It also makes you **wonder what kind of chief executive he'd be at The Times**."

48. In hiring Mr. Thompson, the New York Times either willfully ignored or completely dismissed that he had significant problems with gender and age discrimination while at the BBC.

49. For instance, during his tenure, Moira Stuart, a 58-year-old female newsreader, announced that she was leaving the corporation after a 30-year career at the BBC. Her decision came merely six months after losing her slot reading the news on the show Sunday AM, sparking allegations that age discrimination drove her departure.

50.     In addition, in November 2008, four female BBC presenters of the show "Countryfile," Michaela Strachan, Charlotte Smith, Miriam O'Reilly and Juliet Morris, were all dismissed from the program while male hosts John Craven and Adam Henson were kept on.

51.     Miriam O'Reilly, one of the terminated "Countryfile" presenters, claimed she was "warned about wrinkles," and she filed an age discrimination suit and won a payout against the BBC.

52.     In July 2009, then 66-year-old Arlene Phillips, a former theater choreographer, was replaced on the "Strictly Come Dancing" panel by Alesha Dixon, a 30-year-old pop star. The male judges, whose ages ranged from 44 to 81, were all retained.

53.     One female BBC employee stated that, "[t]here has long been a black joke at the BBC that when a woman's age exceeds her bra size, she is finished."

54.     Another woman stated:  "They wanted [to] send me away on a posting which meant I'd have been separated from my baby at a time when I was breast-feeding."

55.     Ultimately, in the face of a barrage of women claiming discrimination at the BBC, Mr. Thompson acknowledged that these incidents had served as a "wake up call," and admitted that his company had an institutional problem, stating:

> **"Let's not mince words.  Those who say the BBC has a case to answer about the way it treats older women on the air are right – we do . . . [t]here are manifestly too few older women broadcasters on the BBC."**

### The New York Times's Pattern of Gender Discrimination

56.     At the New York Times, only four of the fourteen members of the Board of Directors are women, and out of the ten members of the Company's Executive Committee, Ms. Levien is the only female member.

57.     This fosters an atmosphere where gender roles, stereotypes and biases are reinforced, and where strong, older female voices are considered "pushy" and "difficult," rather than "assertive" and "aggressive."

58.     This was evidenced in part in 2012, when Janet Robinson was terminated for what appeared to be nothing more than purported personality differences, particularly with Arthur Sulzberger Jr.'s then-girlfriend, Claudia Gonzalez.

59.     Following his appointment as CEO, Mr. Thompson deliberately marginalized the most powerful women in the Company, who he could not control.

60.     In 2014, it was widely reported that Jill Abramson, the New York Times's first female Executive Editor, was fired shortly after she complained to Mr. Thompson and Mr. Sulzburger that she was being paid less than her male peers and predecessors.

61.     The New York Times's top brass has stated that she was fired based on personality clashes, though reports have emerged that instead, Ms. Abramson was considered "pushy" or "brusque" – pejorative terms commonly used to describe strong women.

62.     Mr. Thompson's role in Ms. Abramson's termination cannot be ignored.

63.     Before Mr. Thompson started at the New York Times, Ms. Abramson had been investigating his role in the Jimmy Savile scandal.

64.     Although male reporters also covered the story, according to reports, "Mr. Thompson was fucking pissed [at Ms. Abramson]," and his relationship with Ms. Abramson never recovered – despite the fact that Ms. Abramson was simply upholding the New York Times's journalistic principles in pursuing the investigation.

65.     Ms. Abramson's willingness to stand up to a male figure such as Mr. Thompson doubtlessly factored into the reports that she was perceived as "pushy."

16

66.     Much like Janet Robinson, Ms. Abramson was also replaced by a man.

67.     When selecting his inner circle, Mr. Thompson chose Defendant Meredith Levien to fill the newly created role of Chief Revenue Officer.

**The New York Times's Pattern of Race and Age Discrimination**

68.     At the very beginning of her tenure at the Times in 2013, Ms. Levien, as Executive Vice President of Advertising, made it very clear that she was looking for a very particular workforce, one that was filled with "fresh faces," i.e., younger employees without families who generally were white.

69.     Indeed, at a meeting with senior Advertising management, Ms. Levien, under the pretext of a department "presentation," used the opportunity to openly state her discriminatory and strategically wrong-headed goals, and flashed photos of generally older Times employees of color, critiquing them based on their age, marital status, and other protected characteristics.

70.     Ms. Levien's speech also was shockingly rife with racially charged and ageist innuendo, such as references to the need for employees to be "people who look like the people we are selling to," and even going so far as to say "this isn't what our sales team should look like."

71.     Of the 30 or so employees thus "evaluated" by Ms. Levien, nearly all of those who were over the age of 40 and were people of color soon left their employment with the Times, whether "voluntarily" in connection with buyouts or involuntarily by firing.

72.     Ms. Levien's disturbing comments at this meeting were widely known and discussed among the Advertising staff, as they directly targeted the demographic makeup of the division, and indicated which employees could expect to be treated fairly on the basis of the

work they performed, or whether they were merely going to be judged (and pushed out) based on their immutable characteristics, as Ms. Levien had strongly suggested.

73.     Ms. Levien's remarks gave cover to, and outright encouraged, disparate treatment against older employees and employees of color in the Advertising division.

74.     For example, throughout the summer of 2015, Brendan Monaghan, the then-Senior Vice President of Advertising and Publisher of "T: The New York Times Style Magazine," following Ms. Levien's lead, held multiple informal networking events at his home in the Hamptons.  In attendance were numerous Times clients, as well as the Advertising division's white, relatively inexperienced Account Managers.

75.     Notably, neither the named Plaintiffs, nor any other older employees, were invited to these events, despite the significant contributions they could have made as experienced employees with longstanding client relationships.

76.     Mr. Monaghan, during his tenure from around October 2013 to November 2015, had limited all but one of his Account Manager hires to white men under the age of 30, who he dubbed his "handsome men."

77.     On the occasion of Mr. Monaghan's birthday, also during the summer of 2015, he was seen in social media postings with the "handsome men" and other younger, white employees.

78.     Mr. Monaghan took his cues from Ms. Levien, who also was known to host private parties for the younger employees in Advertising.

79.     Ms. Levien also assisted the younger employees more overtly, allocating to them premium tickets and other extras to woo clients, none of which were perks or advantages offered to the named Plaintiffs or older employees of color.

80.     Younger white employees in the division also were given "Summer Fridays," which was time off that was neither offered nor given to older employees of color.

81.     On numerous occasions during 2015, the Advertising staff raised issues of unfair treatment for women, people of color, and older employees at Advertising Diversity Meetings with Michael Golden, the Vice Chairman of the Times, and Matthew Haradon, a Vice President of Human Resources ("HR") at the Times.

82.     Ernestine Grant and Marjorie Walker, along with other diversity committee members and meeting attendees, made numerous protected complaints of discrimination at these meetings, including complaints of wage disparities between people of color and white employees, and complaints of unfair account distribution and steering to low-revenue accounts and positions based on race, gender and age.

83.     For example, one employee complained that the Company had been placing "younger, non-diverse employees on digital and higher revenue teams, whereas older/minority employees feel that they are on teams that are subject to be eliminated or folded Into Group Sales."

84.     Another employee complained that while older employees of color were not promoted, "younger, non-minority employees are regularly moved laterally and promoted – often to positions that are not posted."

85.     Yet another employee also complained that there was a "two-class system" in which "Big revenue categories are assigned to non-diverse employees who are recognized, given awards, merit increases" with "preferential treatment by upper management," whereas "Lower revenue teams for diverse employees have increasing declining revenue … they are given bad reviews and their teams are eventually eliminated from the company."

19

86.     A fourth employee complained that "Older/Minority employees [are] excluded from meetings."

87.     The complaints arose both from committee members' personal experiences, as well as those of other employees in the Advertising division.

88.     Unfortunately, Mr. Golden, like other senior management at the Times, ignored these complaints.

89.     Although he told the committee that he would look into the wage disparities, Mr. Golden troublingly stopped scheduling the meetings altogether because they were supposedly seen as not worthy of his time.

90.     In fact, the meetings were a sham in any case, giving mere lip service to the goal of diversity, and hardly worthy of the Times's supposed commitment to "attract, develop and retain people from a rich variety of experiences, ethnic backgrounds and cultures."

91.     In addition, the Company has not been able to keep all of the discriminatory acts suffered and claimed by its Advertising employees under the management of Defendants Thompson and Levien out of the public realm.  Two federal cases filed in the past 12 months by former employees Tracy Quitasol and Arielle Davies (described above), detail the discriminatory agenda of the Advertising division's management and how it has resulted in the exiting of dozens of older and minority employees, as well as employees with children and/or who avail themselves of family and medical leave.

92.     Indeed, Ms. Levien's bias based on age, gender and race as endorsed by Mr. Thompson also has resulted in glaring and sustained discriminatory compensation decisions.

93.     In 2014, these disparities came to light when employees at the Times underwent changes in title that revealed the substantial discrepancies between employees.

94.     Plaintiffs and other Black women were paid far less than similarly situated white men and, indeed, less than men of color as well.

95.     Moreover, Plaintiffs, like many older employees, also were paid far less than younger, junior employees who had joined the Times only over the last few years, and who were both less productive and less experienced, yet were earning substantially more.

96.     Many of these younger employees had been redistributed the best accounts from older employees, and yet the older employees continued to be more productive despite these account losses.

97.     Despite the widespread discrimination alleged against the Times under their watch, Mr. Thompson and Ms. Levien were both rewarded with massive compensation packages, and even a promotion for Ms. Levien.

## REPRESENTATIVE PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### I.     Plaintiff Ernestine Grant

98.     Ms. Grant began her employment at the Times as an Account Manager.

99.     She quickly established herself as a motivated employee, racking up numerous President's Circle Sales Awards and receiving substantial bonuses over the course of her employment.

100.    Ms. Grant has garnered praise from both supervisors and clients for her excellent work product and results.

101.    In her 2013 year-end review, Ms. Grant was lauded for having "a clear understanding of the business objectives and goals that she is responsible for achieving. She is consistently and proactively connecting with clients to present new ideas and share opportunities."

102.    In addition, her supervisor made note that Ms. Grant "proactively prospects major advertisers" and "made solid gains in securing new business."

103.    Ms. Grant also was praised for her "good work and enthusiasm" and for "immediately incorporat[ing] new knowledge into her work and strategies."

104.    Ms. Grant was told that she "is an excellent and timely communicator both with internal support staff and colleagues, and demonstrates knowledge of a marketer's DNA and the industry they are a part of."

105.    Her collaboration skills were praised as well, with her supervisor stating: "Ernestine is collegial and active during team meetings and will help[] solve shared problems collectively and collaboratively. She is always prepared, engaged, and focused. Her deep experience level is an asset to the team," and "Ernestine is the definition of a team player. She is very open to sharing information and important observations that clients have shared with [her] regarding the industry. She clearly wants the team to succeed and is very supportive when colleagues need assistance."

106.    Critically, her client relationships were also lauded: "Ernestine has built good relationships with clients and she has earned their trust. One example is her relationship with Plus Media agency, the trusted relationship enabled her to close PC Richard[] and Cohen's Optical business in 2013."

107.    She was rated as having overall "good performance," and the review concluded: "Ernestine is an asset to the team. During the recent changes she kept a positive attitude.  She has a depth of product knowledge which she willingly shares, and has earned the respect of colleagues on the teams and in the department."

108.     To this day, she has continued to garner praise, from her work on Wal-Mart web advertising, a variety of Target campaigns, branding with Kohl's, and more.

**Disparate Treatment**

109.     Despite her excellent performance over many years, Ms. Grant was repeatedly passed over for promotion to Advertising Director.

110.     Indeed, Ms. Grant noticed that upon Ms. Levien's hire, the Advertising Directors, who had previously been a mix of races and ages, became as a group increasingly younger and whiter.

111.     Older Advertising Directors of color found themselves pushed out through buyouts, or outright terminated, but those vacancies were rapidly filled with younger, white individuals.

112.     While Ms. Grant sought promotion and advancement commensurate with her abilities and experience, she was denied those opportunities, which were routinely given to younger, white individuals instead.

113.     Moreover, upon information and belief, younger white individuals at the same level as Ms. Grant were paid compensation far in excess of her own.

114.     By way of example only, Perry Tripp, a white male Account Manager who is in his 40s and who joined the Times after Ms. Grant, had been given higher revenue accounts than Ms. Grant.  As a result, his compensation was, upon information and belief, higher than that of Ms. Grant, despite his substantially lesser experience and qualifications.

115.     As an additional example, Mark Lloyd, a white male Account Manager who is in his early 30s and who joined the Times only two years ago, also has been allocated higher

revenue accounts than Ms. Grant, and as such, his compensation is, upon information and belief, substantially higher than that of Ms. Grant, despite far less experience and qualifications.

116.    As an additional example, Maria Eliason, a white female Account Manager who is in her 40s and who joined the Times only three years ago, also has been allocated higher revenue accounts than Ms. Grant, and, therefore, her compensation is, upon information and belief, substantially higher than that of Ms. Grant, despite Ms. Eliason's far less experience and qualifications.

117.    Upon information and belief, Robert Scudder, Maggie Kiselick and Caroline Baccarosse earn far in excess of Ms. Grant due to the unequal distribution of high revenue accounts to each of them.

118.    Ms. Grant was denied opportunities to earn as much as her younger white peers because of her age, race and/or gender.

119.    In addition, Ms. Grant was recently "offered" a buyout.

120.    Ms. Grant was not interested in and did not intend to accept the buyout.

## II.    Plaintiff Marjorie Walker

121.    Ms. Walker began her career with the Times in 2008 as a Telesales Representative in Live Entertainment.

122.    Two short years later, based on her excellent work, Ms. Walker was promoted to Account Manager in the Fashion & Jewelry Department.

123.    In her 2012 year-end review, she was praised for being "savvy about building effective and efficient plans, positioning products to meet the clients objectives and can defend the premium priced environments and products on NYTimes.com."

124.    Her supervisor also lauded her for being "the only A[ccount ]M[anager] who was able to sell ads into the section across all the teams that handle Jewelry accounts."

125.    Indeed, Ms. Walker was told that she had "an excellent knowledge of her clients' lines of business and this has enabled her to make informed decisions when creating plans for them. She visits her stores regularly to do field research and is always hunting for new business. She is very proactive and regularly provides her clients with new creative ideas and sections."

126.    Her collaboration skills were commended, and she was told that she was "a true team player and an asset to the Fashion Jewelry team. She is open and shares her experience and expertise in the retail space with her fellow AMs. She [] is well regarded across the Fashion Categories. She is respectful of all staff she works with at any level of the organization. She is an active member of the Brand Ambassadors and attends many of the diversity and enrichment events available to NYT employees."

127.    The review concluded that: "Marjorie is an integral part of the Fashion Jewelry team. She is driven, passionate about her business and always has her eyes on the lookout for new business. She is building her digital expertise and I[']m excited to see the business she is able to bring in moving forward. Marjorie is a pleasure to work with and I consider her invaluable to this team."

128.    Over the course of her career, her client relationships with numerous high end retail clients were acclaimed.

129.    Despite her excellent work product and strong client relationships, Ms. Walker was given the lowest revenue accounts during her time in the Fashion & Jewelry Department, with higher revenue accounts assigned to her younger, white colleagues.

130.     In 2013, shortly after Ms. Levien joined the Times, Ms. Walker's career trajectory took a sharp downward turn.

131.     During a client meeting, the client praised Ms. Walker to her supervisor at the time, Amanda Smith, who had been hired by Ms. Levien.

132.     In response, Ms. Smith condescendingly told the client, in Ms. Walker's presence, "Oh, Marjorie's a tough girl."

133.     Ms. Smith's statement, not only calling Ms. Walker a "girl," but one who was somehow "tough" apropos of nothing in particular, was racially charged, demeaning, and downright humiliating to Ms. Walker, who had worked hard to gain credibility with her client.

134.     Soon thereafter, Ms. Smith filed an internal arbitration against Ms. Walker, accusing her of insubordination and poor work product and seeking Ms. Walker's suspension.

135.     Ms. Walker personally told Ms. Smith that she had found the "tough girl" comment to be offensive and racially charged.

136.     Ms. Smith then belatedly attempted to withdraw the arbitration against Ms. Walker.

137.     In the end, this discriminatory arbitration was dismissed and the arbitrator declined to suspend Ms. Walker, as Ms. Smith had sought.

138.     HR then approached Ms. Walker to determine how, if at all, the hostile work environment and retaliation by Ms. Smith could be resolved.

139.     In an attempt to be cooperative and to continue working at a job she loved, Ms. Walker proposed a transfer to another Advertising team, unaware that the Times would use the opportunity to demote her instead.

140.     In a meeting with Ms. Smith and Mr. Monaghan, Ms. Walker was told that she was "valuable to the Times," but that the only position available was on the Help Wanted (commonly referred to as the "Recruitment") team.

141.     This position on the Recruitment team was a clear demotion for Ms. Walker.

142.     Compensation in Advertising is based in part on revenues brought in by individual Account Managers.

143.     As such, moving from the prestigious, high-revenue Fashion & Jewelry team to the much lower-revenue Recruitment team had a direct, detrimental impact on Ms. Walker's compensation and career prospects.

144.     Increasingly, older Black employees have been steered to Recruitment and other low-revenue teams to make room for younger white employees on higher revenue teams.

145.     Management also gave older Black Advertising employees different rates to quote to their clients than they gave to younger white employees, which hampered the ability of the disfavored employees to make sales.

146.     Ms. Walker, despite being marginalized because of her protected complaint, worked to improve diversity at the Times, and, like Ms. Grant, was once an active member of the Advertising Diversity committee.

147.     Ms. Walker's demotion also did not preclude her from continuing to service her clients from her Fashion & Jewelry accounts, who repeatedly sought her assistance when coverage by her replacement(s) proved inadequate.

148.     In fact, a number of her client contacts in Fashion & Jewelry continued to contact Ms. Walker when their new Account Managers were being unresponsive.

149.    Ms. Walker ensured that those clients still received optimal service from the Times, despite such contributions going unacknowledged and uncompensated (such as through sales bonuses).

150.    In or around September 2011, Ms. Walker was diagnosed with multiple myeloma, a form of cancer.

151.    As part of her diagnosis, she required medical treatment, including a bone marrow transplant.

152.    It was widely known among staff at the Times, including management-level employees, that Ms. Walker was seeking very expensive medical care.

153.    Moreover, Ms. Walker requires accommodations in order to treat her disability, such as time off for medical appointments and recovery.

**Disparate Treatment**

154.    Despite her excellent performance over many years, Ms. Walker was repeatedly passed over for promotion to Advertising Director.

155.    Older Advertising Directors of color found themselves pushed out through buyouts, or were outright terminated, but those vacancies were rapidly filled by younger, white individuals.

156.    Ms. Walker also sought promotion and advancement commensurate with her expertise and experience, but like Ms. Grant, she was denied those opportunities, which were routinely given to younger, white individuals instead.

157.    Moreover, upon information and belief, younger white individuals at the same level as Ms. Walker were paid compensation far in excess of her own.

158.    By way of example only, Josh Schanen, a white male Account Manager who was recently promoted to Account Director is in his late 30s and joined the Times after Ms. Walker, was given substantially higher revenue accounts than Ms. Walker.  As a result, his compensation is, upon information and belief, higher than that of Ms. Walker, despite his substantially lesser experience and qualifications.  He was later promoted above her to Account Director.

159.    As an additional example, Caroline Boccarossee, a white female Account Manager who is in her late 20s and joined the Times a mere two years ago, also has been allocated higher revenue accounts than Ms. Walker and, as such, her compensation is, upon information and belief, substantially higher than that of Ms. Walker, despite far less experience and qualifications.

160.    Upon information and belief, Mark Lloyd, Maggie Kiselick and Adam Hargis also earn far more than Ms. Walker due to the unequal distribution of high revenue accounts to each of them.

161.    Ms. Walker was denied opportunities to earn as much as her younger white peers because of her age, race and/or gender.

**Buyout Leveraged at Ms. Walker**

162.    In early December 2015, the Times announced buyouts to a number of divisions, including to the Advertising division.

163.    At the same time, Ms. Walker was given the worst review of her career at the Times, with an overall rating of "Needs considerable improvement."

164.    Ms. Walker's supervisor, Ruth Flaig, also gave Ms. Walker scathing critiques of her work, rebuking her for a purported lack of understanding of her clients (strange and untrue,

as well as a critique she had not heard previously), and allegedly not spending enough time seeking out new business.

165.     Ms. Walker was "offered" a buyout.

166.     Ms. Walker did not intend to accept the buyout, however.

167.     Indeed, dissatisfied with her lack of response, her supervisor called Ms. Walker and another older Black Account Manager into a meeting, where they were both told that the department was restructuring, and only one of the two of them in the meeting would have a position by the end of the restructuring.

168.     The supervisor told them that while she was "not telling either of [them] to take the buyout," she wanted to remind them that it was there.

169.     To both Ms. Walker and the other Account Manager, this conversation with their supervisor was a clear directive for at least one of them to take the buyout.

170.     Upon information and belief, none of Ms. Walker's younger, white, male, and/or non-disabled colleagues were given the same message.

171.     Ms. Walker was told by an Account Director that "If we don't do what we're told, we can lose our jobs." She took that statement to mean eliminating employees who did not fit Ms. Levien's image of the ideal employee.

### RACE CLASS ACTION ALLEGATIONS
**(Section 1981 and NYS/NYC Human Rights Law Claims)**

172.     The Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action are being prosecuted as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23. Plaintiffs Ernestine Grant and Marjorie Walker ("Race Class Representatives") incorporate by reference the allegations from the preceding paragraphs of this Class and Collective Action Complaint

alleging common patterns, practices and/or policies resulting in discrimination and retaliation against Black professionals.

173.   The race-based discrimination against Black employees fostered by Company patterns, practices and/or policies include, but are not limited to: (i) paying Black employees, including Plaintiffs, less than similarly situated white employees; (ii) failing to promote Black employees, including Plaintiffs, in favor of similarly or less-qualified white employees; (iii) failure to prevent, address, properly investigate, and/or take remedial action regarding discrimination against Black employees; (iv) paying Black employees, including Plaintiffs, less than similarly situated white employees; and (v) failing to prevent, address, properly investigate, and/or take remedial action regarding discrimination against Black employees.

**Class Definition**

174.   Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of Black employees who have been, are now or will be employed by the Company in its Business division as Account Managers at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Race Class" or the "Race Class Members").  This Class, upon information and belief, consists of at least 40 individuals.

175.   Plaintiffs and the proposed Race Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

176.   The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not an unusual practice for Defendants; rather, disparate treatment and discrimination are part and parcel of their standard operating patterns, practices and/or policies.

**Numerosity and Impracticality of Joinder**

177.    The Race Class Members are sufficiently numerous to make joinder of all of them impracticable.  While the exact number of Race Class Members is unknown because such information is in the exclusive control of Defendants, upon information and belief there are at least 40 current and former Black employees who have been the victim of discriminatory conduct and adverse employment actions by the Times, in violation of federal, state and local law, because they are not white.

178.    Although the number of Race Class Members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**Common Questions of Law and Fact**

179.    The claims alleged on behalf of the Race Class raise questions of law and fact common to the Class.  Chief among these questions is whether Defendants: (i) had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination and retaliation against Black employees in their terms and conditions of employment (including compensation, promotions, and buyouts); and (ii) engaged in a systemic pattern or practice of race-based discrimination or disparate impact discrimination against Black Account Managers in their terms and conditions of employment.

180.    Thus, the common question requirement of FRCP 23(a) is satisfied.

**Typicality of Claims and Relief Sought**

181.    The Race Class Representatives are Members of the Class they seek to represent. The claims of the Class Representatives of Black Employees are typical of the claims of the proposed Race Class in that they all arise from the same unlawful patterns, practices and/or

policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal, state and local law.  The Race Class Representatives and the Race Class Members all allege that they each were the victim of unlawful adverse employment decisions made by Defendants because they are Black Account Managers.  The relief Plaintiffs seek for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Race Class Members.

182.    The discrimination and retaliation experienced by the Race Class Representatives are sadly typical of the disparate treatment faced by Defendants' Black Account Managers.

183.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

**Adequacy of Representation**

184.    The interests of the Race Class Representatives are co-extensive with those of the Race Class Members who they seek to represent in the instant case.  The Race Class Representatives are willing and able to represent the proposed Race Class fairly and vigorously as they pursue their similar individual claims.  The Race Class Representatives have retained counsel who are qualified and experienced in employment class action litigation, and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

185.    The combined interests, experience and resources of the Race Class Representatives and their counsel to competently litigate the individual and Race Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

**Requirements of Rule 23(b)(1)**

186.    Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications

33

and conflicting obligations.  Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.  Accordingly, certification of the proposed Race Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Race Class and Defendants.

187.   By filing this Class and Collective Action Complaint, Plaintiffs are preserving the rights of Race Class Members with respect to the statute of limitations on their claims. Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**Requirements of Rule 23(b)(2)**

188.   Defendants acted on grounds, described herein, generally applicable to Plaintiffs and the Race Class Members, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward Black Account Managers.  These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies.  They are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Race Class as a whole.

189.   Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against Black Account Managers based on their race.

190.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Race Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

191.    Accordingly, injunctive and declaratory relief is among the predominant forms of relief sought in this case.

**Requirements of Rule 23(b)(3)**

192.    The common issues of fact and law affecting the Race Class Representatives' claims and those of the Race Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

193.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the proposed Race Class.

194.    The cost of proving Defendants' pattern and practice of discrimination makes it impractical for the members of the Race Class to pursue their claims individually.

195.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all Race Class Members (they must have worked or be working in Defendants' Business Division as Account Managers), as well as the common questions of law and fact described above.

## AGE CLASS ACTION ALLEGATIONS
### (NYS/NYC Human Rights Law Claims)

196.    The Fifth, Sixth, Seventh, and Eighth Causes of Action are being prosecuted as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23.  Plaintiffs Ernestine Grant and Marjorie Walker ("Age Class Representatives") incorporate by reference the allegations from the preceding paragraphs of this Class and Collective Action Complaint alleging common patterns, practices and/or policies resulting in discrimination and retaliation against older professionals.

197.    The age-based discrimination against older employees fostered by Company patterns, practices and/or policies include, but are not limited to: (i) paying older employees,

including Plaintiffs, less than similarly situated young employees; (ii) failing to promote older

employees, including Plaintiffs, in favor of similarly or less-qualified younger employees; (iii)

failure to prevent, address, properly investigate, and/or take remedial action regarding

discrimination against older employees; (iv) paying older employees, including Plaintiffs, less

than similarly situated younger employees; and (v) failing to prevent, address, properly

investigate, and/or take remedial action regarding discrimination against older employees.

**Class Definition**

198.    Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of

older employees who have been, are now or will be employed by the Company in its Business

division as Account Managers at any time during the applicable liability or statute of limitations

periods, up to and including the date of any judgment in this case (the "Age Class" or "Age Class

Members").  This Age Class, upon information and belief, consists of at least 40 individuals.

199.    Plaintiffs and the proposed Age Class have standing to seek such relief because of

the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on

them individually and generally.

200.    The patterns, practices and/or policies described in this Complaint demonstrate

that discrimination is not unusual for Defendants; rather, such unlawful conduct is part and

parcel of their standard operating patterns, practices and/or policies.

**Numerosity and Impracticality of Joinder**

201.    The Age Class Members are sufficiently numerous to make joinder of all of them

impractical.  While the exact number of Age Class Members is unknown because such

information is in the exclusive control of Defendants, upon information and belief, there are at

least 40 current and former older employees who have been the victim of discriminatory conduct

and adverse employment actions by the Times, in violation of federal, state and local law, because they are older.

202.     Although the number of Age Class Members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**Common Questions of Law and Fact**

203.     The claims alleged on behalf of the Age Class Representatives raise questions of law and fact common to the Class.  Chief among these questions is whether Defendants: (1) had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination and retaliation against older employees in their terms and conditions of employment; and (2) engaged in a systemic pattern or practice of age-based discrimination or disparate impact discrimination against older Account Managers in their terms and conditions of employment.

204.     Thus, the common question requirement of FRCP 23(a) is satisfied.

**Typicality of Claims and Relief Sought**

205.     Age Class Representatives are Members of the Class they seek to represent.  The claims of the Age Class Representatives are typical of the claims of the proposed Age Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal, state and local law.  The Age Class Representatives and the Age Class Members all allege that they each were the victim of unlawful adverse employment decisions, made by Defendants, because they are older Account Managers.  The relief Plaintiffs seek for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Age Class Members.

206.    The discrimination and retaliation experienced by the Age Class Representatives was sadly typical of the disparate treatment faced by Defendants' older Account Managers.

207.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

**Adequacy of Representation**

208.    The interests of the Age Class Representatives are co-extensive with those of the Age Class Members they seek to represent in the instant case.  The Age Class Representatives are willing and able to represent the proposed Age Class fairly and vigorously as they pursue their similar individual claims.  The Age Class Representatives have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

209.    The combined interests, experience and resources of the Age Class Representatives and their counsel to competently litigate the individual and Age Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

**Requirements of Rule 23(b)(1)**

210.    Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.  Accordingly, certification of the proposed Age Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Age Class and Defendants.

211.    By filing this Class and Collective Action Complaint, Plaintiffs are preserving the rights of Age Class Members with respect to the statute of limitations on their claims.  Therefore,

38

not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**Requirements of Rule 23(b)(2)**

212.    Defendants acted on grounds, described herein, generally applicable to Plaintiffs and the Age Class Members, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward Age Class Members.  These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies.  They are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Age Class as a whole.

213.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against Age Class Members based on their age.

214.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Age Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

215.    Accordingly, injunctive and declaratory relief is among the predominant forms of relief sought in this case.

**Requirements of Rule 23(b)(3)**

216.    The common issues of fact and law affecting the Age Class Representatives' claims and those of the Age Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

217.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the proposed Age Class.

218.    The cost of proving Defendants' pattern and practice of discrimination makes it impractical for the members of the Age Class to pursue their claims individually.

219.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all Age Class Members (they must have worked or be working in Defendants' Business Division as Account Managers), as well as the common questions of law and fact described above.

## GENDER CLASS ACTION ALLEGATIONS
### (NY Labor Law and NYS/NYC Human Rights Law Claims)

220.    The Second, Fifth, Sixth, Seventh, and Eighth Causes of Action are being prosecuted as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23.  Plaintiffs Ernestine Grant and Marjorie Walker ("Gender Class Representatives") incorporate by reference the allegations from the preceding paragraphs of this Class and Collective Action Complaint alleging common patterns, practices and/or policies resulting in discrimination and retaliation against female professionals.

221.    The gender-based discrimination against female employees fostered by Company patterns, practices and/or policies include, but are not limited to: (1) paying female employees, including Plaintiffs, less than similarly situated male employees; (2) failing to promote female employees, including Plaintiffs, in favor of similarly or less-qualified male employees; (3) failure to prevent, address, properly investigate, and/or take remedial action regarding discrimination against female employees; (4) paying female employees, including Plaintiffs, less than similarly situated male employees; and (5) failing to prevent, address, properly investigate, and/or take remedial action regarding discrimination against female employees.

**Class Definition**

222.    Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of female employees who have been, are now or will be employed by the Company in its Business division as Account Managers at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Gender Class" or "Gender Class Members").  This Gender Class, upon information and belief, consists of at least 40 individuals.

223.    Plaintiffs and the proposed Gender Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

224.    The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual for Defendants; rather, such unlawful is part and parcel of their standard operating patterns, practices and/or policies.

**Numerosity and Impracticality of Joinder**

225.    The Gender Class Members are sufficiently numerous to make joinder of all of them impractical.  While the exact number of Gender Class Members is unknown because such information is in the exclusive control of Defendants, upon information and belief, there are at least 40 current and former female employees who have been the victim of discriminatory conduct and adverse employment actions by the Times, in violation of federal, state and local law, because they are female.

226.    Although the number of Gender Class Members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**Common Questions of Law and Fact**

227.    The claims alleged on behalf of the Gender Class Representatives raise questions of law and fact common to the Class.  Chief among these questions is whether Defendants: (1) had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination and retaliation against female employees in their terms and conditions of employment; and (2) engaged in a systemic pattern or practice of gender-based discrimination or disparate impact discrimination against female Account Managers in their terms and conditions of employment.

228.    Thus, the common question requirement of FRCP 23(a) is satisfied.

**Typicality of Claims and Relief Sought**

229.    Gender Class Representatives are Members of the Class they seek to represent. The claims of the Gender Class Representatives are typical of the claims of the proposed Gender Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal, state and local law.  The Gender Class Representatives and the Gender Class Members all allege that they each were the victim of unlawful adverse employment decisions, made by Defendants because they are female Account Managers.  The relief Plaintiffs seek for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Class Members.

230.    The discrimination and retaliation experienced by the Gender Class Representatives was sadly typical of the disparate treatment faced by Defendants' female Account Managers.

231.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

**Adequacy of Representation**

232.    The interests of the Gender Class Representatives are co-extensive with those of the Gender Class Members they seek to represent in the instant case.  The Gender Class Representatives are willing and able to represent the proposed Gender Class fairly and vigorously as they pursue their similar individual claims.  The Gender Class Representatives have retained counsel who are qualified and experienced in employment class action litigation, and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

233.    The combined interests, experience and resources of the Gender Class Representatives and their counsel to competently litigate the individual and Gender Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

**Requirements of Rule 23(b)(1)**

234.    Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Specifically, all evidence of Defendants' patterns, practices and/or policies, and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.  Accordingly, certification of the proposed Gender Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Gender Class and Defendants.

235.    By filing this Class and Collective Action Complaint, Plaintiffs are preserving the rights of Gender Class Members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**Requirements of Rule 23(b)(2)**

236.    Defendants acted on grounds, described herein, generally applicable to Plaintiffs and the Gender Class Members, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward Gender Class Account Managers.  These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies.  They are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Gender Class as a whole.

237.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against Gender Account Managers based on their gender.

238.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Gender Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

239.    Accordingly, injunctive and declaratory relief is among the predominant forms of relief sought in this case.

**Requirements of Rule 23(b)(3)**

240.    The common issues of fact and law affecting the Gender Class Representatives' claims and those of the Gender Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

241.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the proposed Gender Class.

242.     The cost of proving Defendants' pattern and practice of discrimination makes it impractical for the members of the Gender Class to pursue their claims individually.

243.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all Gender Class Members (they must have worked or be working in Defendants' Business Division as Account Managers), as well as the common questions of law and fact described above.

## COLLECTIVE ACTION ALLEGATIONS
### (Equal Pay Act Claims)

244.     The First Cause of Action is being prosecuted as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).  Plaintiffs incorporate by reference the allegations from the preceding paragraphs, including those alleging class-based and common patterns, practices and/or policies by Defendants resulting in unlawful discrimination and retaliation, as if fully set forth herein.

245.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a collective of female professionals who have been, are now or will be employed by Defendants in their Advertising division in New York at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "EPA Collective" or "EPA Collective Members").  This Collective, upon information and belief, consists of more than 40 individuals.

246.     Defendants' systemic discrimination against the EPA Collective based upon gender is described in this Class and Collective Action Complaint and is continuing in nature. The EPA Collective Members were paid less and denied promotions at a greater rate by Defendants than were similarly situated male employees, despite performing similar or the same work and having comparable or better experience and qualifications.

247.    Defendants' discrimination against Plaintiffs and the EPA Collective was the result of Defendants' common patterns, practices and/or policies, and Defendants' acquiescence to and ratification of such patterns, practices and/or policies.  The claims of Plaintiffs stated herein are essentially the same as those of the other EPA Collective Members.

248.    The First Cause of Action is properly brought under and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b).  The EPA Collective is readily ascertainable and the names and addresses of the EPA Collective Members are readily ascertainable from Defendants.

249.    Common questions of law and fact predominate with respect to Plaintiffs and the EPA Collective Members, who are similarly situated as female Advertising employees with substantially similar job duties, titles and qualifications, and were subject to substantially similar Company employment patterns, practice and/or policies.

**FIRST CAUSE OF ACTION**
**(Violations of the Equal Pay Act)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

250.    Plaintiffs hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

251.    The claims brought herein under the Equal Pay Act, 29 U.S.C. §206 *et seq*., are brought on behalf of the Plaintiffs and all members of the EPA Collective.

252.    During the period of the employment of Plaintiffs and all members of the EPA Collective, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq*.  During that time, Defendants required Plaintiffs and the members of the EPA Collective to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid

46

Plaintiffs and the members of the EPA Collective at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

253.    Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiffs and the members of the EPA Collective on the basis of their gender and by paying Plaintiffs and the EPA Collective Members a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

254.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. §206 *et seq*.

255.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiffs and the EPA Collective Members have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

256.    Plaintiffs and the members of the EPA Collective are further entitled to liquidated damages, reasonable costs and attorneys' fees.

### SECOND CAUSE OF ACTION
**(Violations of New York Labor Law Equal Pay Law)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

257.    Plaintiffs and the members of the Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

258.     The claims brought herein under the New York Labor Law § 194 are brought on behalf of the Plaintiffs and all members of the Gender Class.

259.     During the period of the employment of Plaintiffs and the members of the Gender Class, Defendants were subject to the provisions of the New York Labor Law § 194.  During the employment of Plaintiffs and the members of the Gender Class, Defendants required Plaintiffs and the members of the Gender Class to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiffs and the members of the Gender Class at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training, or experience.

260.     Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative unwillfully, discriminated against Plaintiffs and the members of the Class on the basis of their gender by paying Plaintiffs and the members of the Class a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishment.

261.     By the actions described above, among others, Defendants have violated the New York Labor Law.

262.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the New York Labor Law, Plaintiffs and the members of the Class have

suffered, and continue to suffer, harm for which they are entitled to an award of monetary

damages and other relief.

263.    Plaintiffs and the members of the Class are further entitled to liquidated damages,

reasonable costs and attorneys' fees.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of Section 1981)
### (Individual and Class Action Claims)
### (Against all Defendants)

264.    Plaintiffs and the members of the Race Class hereby repeat and re-allege each and

every allegation in all of the preceding paragraphs as if fully set forth herein.

265.    By the actions described above, among others, Defendants have discriminated

against Plaintiffs and the members of the Race Class on the basis of their race and/or color in

violation of Section 1981 by denying them the same terms and conditions of employment

available to employees who are white, including, but not limited to, subjecting them to disparate

working conditions and denying them terms and conditions of employment equal to that of

employees who are white.

266.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of Section 1981, Plaintiffs and the members of the Race Class have suffered,

and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of

future income, compensation and benefits for which they are entitled to an award of damages.

267.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of Section 1981, Plaintiffs and the members of the Race Class have suffered,

and continue to suffer, emotional distress for which they are entitled to an award of

compensatory damages.

268.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' and the members of the Race Class's rights under Section 1981 for which Plaintiffs and the members of the Race Class are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

269.     Plaintiffs and the members of the Race Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

270.     By the actions described above, among others, Defendants retaliated against Plaintiffs and members of the Race Class for making protected complaints regarding discrimination on the basis of race to, among others, members of the Times's Executive Committee, including Michael Golden, and then selecting and directing them to take buyouts.

271.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiffs and the members of the Race Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

272.     Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' and the members of the Race Class's rights under Section 1981 for which Plaintiffs and the members of the Race Class are entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### (Individual and Class Action Claims)
### (Against all Defendants)

273.     Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

274.     Defendants have discriminated against Plaintiffs and the members of the Race Class on the basis of their race, ethnicity and/or national origin, Age Class on the basis of their age and Gender Class on the basis of their gender in violation of the NYSHRL by denying the respective classes the same terms and conditions of employment available to employees who are white, younger, and/or male, including, but not limited to, subjecting them to disparate working conditions and compensation, and ultimately selecting and directing them to accept buyouts.

275.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation the NYSHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered and continue to suffer monetary and/or economic harm for which they are entitled to an award of damages.

276.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

277.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' and the Race Class, Age Class, and/or Gender Class's rights under the NYSHRL, for which Plaintiffs and the Race Class, Age Class, and/or Gender Class are entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

278.    Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs.

279.    By the actions described above, among others, Defendants have retaliated against Plaintiffs and the members of the Race Class, Age Class and/or Gender Class on the basis of their protected activities in violation of the NYSHRL by, *inter alia*, ignoring their protected complaints about the discriminatory treatment of non-white, older and/or female employees, by subjecting them to increased scrutiny and harassment and ultimately selecting and directing them to accept buyouts.

280.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

281.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiffs and the members of the Race Class, Age Class, and/or

52

Gender Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

282.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' and the members of the Race Class, Age Class, and/or Gender Class's rights under the NYSHRL, for which Plaintiffs and the members of the class are entitled to an award of punitive damages

**SEVENTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

283.    Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

284.    Defendants have discriminated against Plaintiffs and the members of the Race Class on the basis of their race, ethnicity and/or national origin, Age Class on the basis of their age and Gender Class on the basis of their gender in violation of the NYCHRL by denying them the same terms and conditions of employment available to employees who are white, younger, and/or male, including, but not limited to, subjecting them to disparate working conditions and compensation, and ultimately selecting and directing them to accept buyouts.

285.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

286.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of damages.

287.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class are entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
**(Individual and Class Action Claims)**
**(Against all Defendants)**

288.    Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

289.    By the actions described above, among others, Defendants retaliated against Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class on the basis of their protected activities in violation of the NYCHRL by, *inter alia*, ignoring their protected complaints about the discriminatory treatment, subjecting them to increased scrutiny and harassment and ultimately selecting and directing them to accept buyouts.

290.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, monetary and/or other economic harm for which they are entitled to an award of monetary damages and other relief.

291.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs and the members of the Race Class, Age Class, and/or

Gender Class have suffered, and continue to suffer, emotional distress, for which they are entitled to an award of monetary damages and other relief.

292.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class are entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**
**(Against all Defendants)**

293.    Plaintiff Marjorie Walker hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

294.    Defendants have discriminated against Plaintiff Walker in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, subjecting her to disparate working conditions and compensation, and ultimately selecting and directing her to accept a buyout because of her disability, and because Defendants regarded her as disabled.

295.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff Walker has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages.

296.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff Walker has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

## TENTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### (Against all Defendants)

297.    Plaintiff Marjorie Walker hereby repeats and re-alleges each and every allegation in the above paragraphs, inclusive, as if fully set forth herein.

298.    Plaintiff Walker suffers from a disability, was perceived as suffering from a disability, and/or had a record of disability as define by the NYCHRL.

299.    Defendants discriminated against Plaintiff Walker on the basis of her disability in violation of the NYCHRL by, *inter alia*, subjecting her to disparate working conditions and compensation, and ultimately selecting and directing her to accept a buyout because of her disability, as well as because Defendants regarded her as disabled.

300.    The discrimination and harassment against Plaintiff Walker took place, in part, at her workplace at the Company.

301.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff Walker has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

302.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff Walker has suffered, and continues to suffer, emotional distress for which she is entitled to an award of monetary damages and other relief.

303.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff Walker's protected rights under the NYCHRL, for which Plaintiff Walker is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
**(Individual and Class Action Claims)**
**(Against Defendants Thompson and Levien)**

304.     Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

305.     Defendants Thompson and Levien knowingly or recklessly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class in violation of the NYSHRL.

306.     As a direct and proximate result, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered and continue to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits, for which they are entitled to an award of monetary damages and other relief.

307.     As a direct and proximate result, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of monetary damages and other relief.

**TWELFTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYCHRL)**
**(Individual and Class Action Claims)**
**(Against Defendants Thompson and Levien)**

308.     Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

309.     Defendants Thompson and Levien knowingly or recklessly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class in violation of the NYCHRL.

310.     As a direct and proximate result, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered and continue to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which they are entitled to an award of monetary damages and other relief.

311.     As a direct and proximate result, Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of monetary damages and other relief.

312.     Defendants Thompson and Levien's unlawful, discriminatory and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiffs and the members of the Race Class, Age Class, and/or Gender Class are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Collective and Class Members pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. §216, and direct Defendants to provide Plaintiffs with a list of all members of the EPA Collective, including all last known addresses, telephone numbers and e-mail addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Determine the damages sustained by Plaintiffs and the EPA Collective as a result of Defendants' violations of the EPA, and award those damages against Defendants and in favor of Plaintiffs and the EPA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

E.    Award Plaintiffs and the EPA Collective an additional equal amount as liquidated damages because Defendants' violations were willful and/or without a good faith basis;

F.    Declare this action to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list of all members of the Age, Race, and Gender Classes, including all last known addresses, telephone numbers and e-mail addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

G.      Designate Plaintiffs as representatives of their class, and their counsel of record as class counsel;

H.      Award Plaintiffs and the Gender Class an additional amount as liquidated damages pursuant to the NYLL because Defendants' violations were willful and/or without a good faith basis;

I.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and Collective and Class Members for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

J.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and collective and class members for harm to their professional and personal reputations and loss of career fulfillment;

K.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and Collective and Class Members for all non-monetary and/or compensatory damages, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

L.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs and Collective and Class Members in an amount to be determined at trial, plus prejudgment interest;

M.      An award of punitive damages in an amount to be determined at trial;

N.      An award of costs that Plaintiffs and Collective and Class Members have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' and

Collective and Class Members' reasonable attorneys' fees and costs to the fullest extent

permitted by law; and

O.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs and collective and class members hereby demand a trial by jury on all issues of

fact and damages stated herein.

Dated: April 28, 2016
         New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
       Douglas H. Wigdor
       Lawrence M. Pearson
       Elizabeth J. Chen

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
lpearson@wigdorlaw.com
echen@wigdorlaw.com

*Counsel for Plaintiffs, the Proposed EPA
Collective and Race, Age and Gender
Classes*