IaiWgraO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ERNESTINE GRANT, on behalf of
     herself individually and on
4    behalf of all similarly
     situated persons,
5
                    Plaintiff,
6
              v.                              16 Civ. 3175 (PKC)
7
     THE NEW YORK TIMES COMPANY,
8    *et al.*,

9                                             Oral Argument
                 Defendants.
10
     ------------------------------x
11                                            New York, N.Y.
                                              October 18, 2018
12                                            2:00 p.m.

13   Before:

14                      HON. P. KEVIN CASTEL,

15                                            District Judge

16                           APPEARANCES

17   WIGDOR LLP
          Attorneys for Plaintiff
18   BY:  LAWRENCE M. PEARSON
          HILARY J. ORZICK
19

20   PROSKAUER ROSE LLP
          Attorneys for Defendants
21   BY:  MARK W. BATTEN
          LARISSA R. BOZ
22        GREGORY I. RASIN

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

IaiWgraO

1          (Case called)

2          MR. PEARSON:  Good afternoon, your Honor.  Larry

3   Pearson of Wigdor LLP, here with my colleague Hilary Orzick,

4   for the plaintiffs.

5          THE COURT:  All right.  Good to meet you, Mr. Pearson.

6          MR. BATTEN:  Good afternoon, your Honor.  Mark Batten,

7   with Larissa Boz and Greg Rasin, for the defendants.

8          THE COURT:  All right.  Good to see you all.

9          I guess thinking about this there are several issues

10  in my mind.  One is, has the plaintiff had a full and fair

11  opportunity to conduct discovery on 23(a)(1), whether the class

12  is so numerous as to make joinder impracticable?

13          No. 2, what does that discovery show?

14          Of course, these questions are asked both as to a race

15  class and an age class.

16          And No. 3 is what, if any, is the proper procedural

17  vehicle to dispose of the issue?

18          Let's focus for the moment on issue No. 1, and since

19  the defendants are the movants, I'll give them an opportunity

20  to address the question of what kind of discovery the plaintiff

21  has had with regard to 23(a)(1).

22          MR. BATTEN:  Thank you, your Honor.

23          I'll just address that first question.

24          THE COURT:  Yes.

25          MR. BATTEN:  The plaintiffs have the identities of all

IaiWgraO

1    of the individuals who are potentially in the class.

2              THE COURT:  What does that mean?  What has your client

3    done in discovery that leads you to that as the conclusion?

4              MR. BATTEN:  There has been production of about 4,000

5    documents so far, your Honor, which include complete details --

6    names, positions, demographic details, compensation details --

7    about all of the account managers who worked in the advertising

8    department during the relevant period.

9              THE COURT:  And what is that?  Is that personnel

10   files, or what have you given them?

11             MR. BATTEN:  It's spreadsheets of information,

12   primarily, supplemented with, as relevant to this motion,

13   copies of release documents that, as you know, a number of the

14   individuals have signed; copies of buyout documents that were

15   made available to individuals so that they could choose whether

16   they wanted to take a buyout or not.  They have that

17   information as well.

18             To answer the question about whether the plaintiffs

19   have had enough discovery, the answer may be separate from the

20   race class versus the age class, because with respect to the

21   proposed race class, there simply have only been ten

22   African-American account managers at The New York Times Company

23   during the relevant period, regardless of how you count; that

24   is to say, whether you count the people who have signed the

25   releases or not, the number is ten.  And if we exclude from

IaiWgraO

1    this class the individuals who have signed releases, the number

2    is six.  We would say that with respect to the race class,

3    there is no discovery to be done, because whatever you do,

4    whatever more information you find out, there are never going

5    to be more than ten potential class members.

6           THE COURT:  And the six includes the two plaintiffs.

7           MR. BATTEN:  Correct, so only four others who are not

8    before the Court, your Honor, and who have not signed releases.

9           With respect to the age class, there is, maybe, a

10   little bit more to talk about because the release issue becomes

11   more important in the sense that if you include in the class

12   the people who have signed releases, the number is 59.  Again,

13   there's no more discovery necessary about that number.

14   Plaintiffs have all the information about those people, all

15   their details, 35 of whom have signed releases, and those

16   documents have been produced, leaving a potential class of 24.

17          THE COURT:  Again, 59 account managers in the relevant

18   time period who are above the age of 40.

19          MR. BATTEN:  Correct.

20          THE COURT:  Right.  And what is the number who have

21   signed releases?

22          MR. BATTEN:  35, your Honor.

23          THE COURT:  All right.

24          MR. BATTEN:  Leaving 24 who have not, 14 of whom are

25   current employees, 10 of whom have left.

IaiWgraO

1          THE COURT:  All right.

2          MR. BATTEN:  And again, those figures include the two

3     named plaintiffs as well, obviously.

4          THE COURT:  All right.

5          Let me hear from Mr. Pearson on the question of

6     whether you have had full and fair discovery with regard to

7     numerosity relating to the race class, and then the age class.

8          MR. PEARSON:  Certainly, your Honor.

9          Our view is that we have not had a full and fair

10     opportunity, your Honor.  Numerosity, the number of people in

11     these classes, is a factor.  It is an important factor.  It's

12     not the only factor, but to address the Court's question

13     directly, even with regard to 23(a)(1), even with regard to

14     numerosity, there has not been full and fair discovery.

15          I'm glad that the releases were mentioned as a factor.

16          THE COURT:  No.  Let's talk about the race class first

17     before we get to the age class.

18          MR. PEARSON:  OK.

19          THE COURT:  Go ahead.

20          MR. PEARSON:  Certainly.

21          With regard to the race class, there were only, there

22     are about four people, we believe it's four people, in the race

23     class who signed releases.  Right?  There are six who have not

24     signed releases.  So the race class -- and there is overlap

25     between the race and age class, so the race class would

IaiWgraO

1    increase to ten.

2            The problem is, the reason that the releases become

3    very, very relevant, even with only six people, even with only

4    ten people in the race class, we haven't had an opportunity to

5    take discovery on the practices surrounding not just the

6    releases, not just these supposedly voluntary buyouts, but

7    retention trends.  Right?

8            We do have data on a few years, the employees who were

9    in the advertising division and in the account manager

10   position, but we have not had an opportunity -- discovery has

11   been on hold.  We have not had an opportunity to do a

12   statistical analysis of retention trends, of people coming in.

13   We have not had a chance to talk with the witnesses, depose the

14   defense witness, depose the management of the advertising

15   division about their preferences, their hiring preferences,

16   which is central to our allegation.

17           THE COURT:  If you had a single-plaintiff case or a

18   two-plaintiff case, there is, I don't know whether the right

19   term is "a certain amount" or "quite a bit" of that that is

20   appropriately within the scope of discovery you might conduct

21   to prove your case.  That's not in dispute here.

22           The question that I'm focusing on at the moment is

23   23(a)(1), and the funny part about 23(a)(1) is numbers are

24   numbers, and with regard to the race class, if there are four

25   who signed releases and six who didn't sign releases, at least

IaiWgraO

1   as to the race class, the number still becomes ten, unless

2   there's some reason to believe it should be eleven or twelve or

3   some other number.  But unless there's some basis for that ten

4   to change, it's ten.  And we can talk about what that means.

5   We can talk about your argument with regard to injunctive

6   relief.  We can talk about a lot of different things, but ten,

7   it sounds like, remains ten, at max.

8          MR. PEARSON:  Likely it will remain that, your Honor.

9   I, frankly, don't know where the data came from, whether it's

10  self-ID forms, whether they did a visual survey.  I don't know

11  that.  I'm not calling into question the veracity of the data.

12         THE COURT:  Right.

13         MR. PEARSON:  But just to underscore the point as to

14  how relatively little discovery we've received here, we really

15  haven't received much, if almost any, electronic discovery, for

16  instance, despite the fact that the parties had committed to

17  doing that.  I don't know where the data came from.  Right?  So

18  that in itself is something that, as an attorney in a

19  litigation, I'd like to know, what the provenance of this data

20  is, although, again, I'm not calling it into question.  Right?

21  But the Court is correct that as of right now, I don't have a

22  basis to say that ten may change.

23         THE COURT:  Right.

24         MR. PEARSON:  However, we certainly would want the

25  opportunity to be heard about the idea that future employees

IaiWgraO

1    should also be considered under declaratory injunctive relief,

2    and things like that, as to whether or not the class mechanism

3    is the correct one here.

4            THE COURT:  Right.

5            Now talk to me about age.

6            MR. PEARSON:  Yes.

7            With respect to age, certainly with 24 people, we

8    believe that, particularly with the declaratory injunctive

9    relief, the current employee factor, that number would support

10   class.  In addition to those 24, you do have these 35 people

11   who signed releases, and we certainly would want to take

12   discovery.

13           THE COURT:  If it's 24, you're in what is colloquially

14   known as the gray area, 21 to 40.

15           MR. PEARSON:  I think that's fair, your Honor, under

16   the case law.

17           THE COURT:  Right.

18           MR. PEARSON:  With respect to the other people who

19   signed releases and, frankly, the practice in general -- and

20   there are other things, obviously, that we point to --

21   discovery certainly should be taken, because it seems that

22   those buyouts disproportionately affected people who were

23   older.

24           I'll give an example.  The buyout package that was

25   received by Ms. Grant, one of the individual plaintiffs, came

1    with a list of the people who were eligible and the people who

2    were not eligible for one of these buyout packages at that

3    time, and that listed the ages of the people and whether or not

4    they were eligible.

5          If you look at the employees who were on that list, 31

6    of the 165 people under 40 were eligible.  That's about 19

7    percent.  The higher you go in age, the larger and larger that

8    percentage gets, and it's not as though you needed to have 20

9    years of tenure with the Times in order to be eligible for one

10   of these.

11         For instance, the over-40 cohort, 8 out of 22 were

12   eligible, so you go from 19 to 36; over 50, 9 out of 17, so 53

13   percent; over 60, 5 out of 7, 71 percent.

14         THE COURT:  Do you know what the criteria was for

15   offering the buyout?

16         MR. PEARSON:  I believe, from reading it recently, in

17   preparation for the conference, a few days ago, you needed at

18   least a year, and there were maybe one or two other factors,

19   with the company.

20         But the fact is, was it that mechanical, or did they

21   pick and choose?  We don't know, your Honor.

22         THE COURT:  All right.  That's an interesting point.

23   Let me hear from defense counsel.

24         I think Mr. Pearson said it very well.  Did the

25   employer pick and choose, or was it mechanical?

IaiWgraO

1          MR. BATTEN:  The answer is that it was mechanical, and

2     the plaintiffs know it was mechanical from the documents that

3     have already been produced.  The very buyout document that

4     Mr. Pearson was just referring to says, page 1135 of the

5     exhibit, every nonunion and union U.S.-based sales employee in

6     the advertising department, as long as they had a year of

7     service, was offered the buyout.

8          To make it more specific, let's recall that the

9     complaint seeks to certify a class of account managers, a

10    specific job title within the advertising department.  A lot of

11    the people on this list who were not offered the buyout are not

12    account managers.  If you look at the list, it has the titles

13    in there as well.  Every single account manager, except for

14    those newly hired, without a year of service, was offered the

15    buyout.

16         THE COURT:  What if you had a new hire who was over 40

17    but had less than a year; would they have been eligible for the

18    buyout?

19         MR. BATTEN:  No, your Honor, and the document says

20    that.

21         THE COURT:  All right.

22         MR. BATTEN:  The material that the plaintiffs need in

23    order to make this assessment has already been produced in

24    discovery.  All of the buyouts that have been offered have been

25    offered that way; that is, to the entire advertising

IaiWgraO

 1    department.  And there is no basis on which to conclude that

 2    anybody was coerced into accepting a voluntary buyout.

 3    Remember that these are voluntary buyouts, so even if the

 4    employer, hypothetically, disproportionately offered them to

 5    older employees, that's providing a benefit to an older

 6    employee, not a burden.

 7           The question would have to be, for numerosity

 8    purposes, was someone coerced?  And among other problems with

 9    that as a basis for numerosity, it's a very individualized

10    issue.  Even if we were beyond discovery -- all discovery --

11    and the Court was considering a full-blown motion for class

12    certification, we'd still be talking about numerosity, and the

13    question would be, can this case be decided on a class basis or

14    not?  The plaintiffs would be saying certification is going to

15    depend on many hearings about each individual in the class;

16    were they coerced into signing the release or not?  That's not

17    a class.

18           THE COURT:  That's also not numerosity.

19           MR. BATTEN:  Well, it is in the sense that you have to

20    know who's in the class to decide whether it can be certified

21    or not.  There's an ascertainability requirement that goes

22    along with numerosity, and when we're trying to figure out

23    who's in and who's out, if you have to have a trial on the

24    voluntariness of the release, that's not a class.

25           THE COURT:  Let me ask a question, out of ignorance.

1   Mr. Pearson may be the better person to ask, but since you're

2   standing up, I'll ask you and then I'll ask Mr. Pearson.

3           When is the offering of a buyout to an older worker

4   actionable, and are the allegations of this complaint broad

5   enough to pick that up as an actionable claim?

6           MR. BATTEN:  No, your Honor.

7           If there was an involuntary layoff disproportionately,

8   there would be a claim for that, but a voluntary buyout is an

9   offer that can be accepted or declined; We're going to give you

10  this much in severance if you agree to leave.

11          THE COURT:  Is there any case law on that?  Has

12  anybody ever tried to, that you know of, argue that that's

13  discriminatory?  I'm asking this out of total ignorance.  Could

14  an employer say I'm offering voluntary buyouts only to

15  employees who have reached their 40th birthday and not to those

16  who haven't?

17          MR. BATTEN:  That actually happens all the time, your

18  Honor, because a lot of times the reason the employer wants to

19  reduce its workforce is to cut expenses.  And just because of

20  tenure and raises and so forth, sometimes the older employees

21  are the more expensive because their compensation is higher.

22  It's not at all uncommon to say, for example, you have to have

23  a combination of years of service and age that reach some

24  number, X, in order to be eligible.  It happens all the time.

25          THE COURT:  All right.  Let me give Mr. Pearson an

IaiWgraO

opportunity to explain his position further with regard to the
buyout.

          The argument is proffered that these are people who
voluntarily decided to take the buyout; that it was
mechanically available to anyone with one year or more service;
that among the account managers, the numbers are what they are;
and that those who accepted the buyout issued releases in
connection therewith.

          MR. PEARSON:  Yes, your Honor.

          This wouldn't require a trial on voluntariness with
respect to each person.  What the case is about, what the
allegations concern, what the class discovery would largely
focus on, is whether or not this had a disproportionate impact
on the older employees.  And there is some anecdotal evidence
that we've learned of, through our clients, that people were
brought in and told, You know, you really ought to do this.

          THE COURT:  But hang on.  Is there anything unlawful
in designing a buyout that will have a disproportionate impact
on older workers, because it goes for workers with higher
salaries, and that necessarily impacts disproportionately older
workers?  Is that unlawful to do?

          MR. PEARSON:  It depends on the facts, your Honor.  It
could be, particularly if that is part of the intent, and if
there is an effect in the workplace that if somebody turns down
such a package, their prospects -- their work environment --

IaiWgraO

1    are going to get worse.  Right?  So yes, if the motivation is

2    there, if the disparate impact is pronounced enough, then there

3    really ought to be a different mechanism that's used.

4             I agree that employers can be stuck between a rock and

5    a hard place if they're conducting a reduction in force or

6    something like that and they're trying to cut payroll and there

7    may be some correlation, but that is why these decisions need

8    to be made deliberately, and mechanisms shouldn't be used that

9    will have either this kind of effect or that conveniently

10   achieve this kind of effect when it's the effect that it

11   desired.

12            There are allegations in this case, your Honor, that

13   there was an express preference for fresh faces, for a

14   workforce that is younger and more affluent-seeming.  This

15   deliberate policy very much seems to be a part of that, and it

16   would be ironic.

17            THE COURT:  What deliberate policy?

18            MR. PEARSON:  A policy of issuing buyouts.

19            THE COURT:  But this is not a case where the buyout

20   was targeted to any one group.  It's a buyout which anyone

21   employed more than one year can take.

22            MR. PEARSON:  Correct, your Honor.

23            THE COURT:  That's what's proffered here.

24            MR. PEARSON:  And a buyout is going to be -- and I

25   haven't crunched the numbers on the money, how the money jumps

IaiWgraO

1  after so many years of tenure, that sort of thing.  I don't

2  have mastery of all of that, but logic and common sense says

3  that someone isn't generally going to take a buyout akin to a

4  retirement package or moving on after they've been with an

5  employer for a year.  It's typically going to be people who

6  have been around for a longer amount of time.

7          THE COURT:  Because they'll get more under the

8  package.

9          MR. PEARSON:  They'll get more under the package, it's

10  true.

11          THE COURT:  Why is that a bad thing, an unlawful

12  thing, a rude thing, something that should be discouraged

13  rather than encouraged?

14          MR. PEARSON:  It shouldn't be discouraged in every

15  case.  It's a mechanism that lots of employers use, obviously.

16          THE COURT:  Is it a good thing or a bad thing for

17  employees?

18          MR. PEARSON:  It completely depends on the situation,

19  but where an employee is brought in and told, Look, one of you

20  longer tenured employees needs to do this, or where someone

21  gets the feeling that after she turns it down, because she

22  wants to keep working, her opportunities, her perks, all these

23  things continue to atrophy, where you have retaliation, where

24  you have a workforce that is increasingly hostile to older

25  workers, it can be a bad thing, because it can feel, even if it

IaiWgraO

```
 1    isn't expressly said -- and again, we don't have the discovery
 2    on whether or not it was expressly said to people or suggested
 3    heavily to people.  We haven't had depositions.  We don't have
 4    emails saying, Hey, have you followed up with Marjorie on her
 5    buyout or followed up with Ernestine on her buyout?  We don't
 6    have that.
 7               Where that happens, then it is a bad thing.  It is
 8    something that is otherwise at least possibly neutral that is
 9    being used to achieve an unlawful end.  And we have not had the
10    opportunity to do that.  That not only goes to numerosity, but
11    it goes to the importance of the declaratory injunctive relief,
12    which whether we have 6 people or 24 people or 59 people, is
13    something that is very, very appropriate for class discovery
14    and class treatment.
15               THE COURT:  Let me ask you this.  Can't you get an
16    injunction in a single-plaintiff case?
17               MR. PEARSON:  You can achieve injunctive relief.
18    However, the discovery, other things are not the same.
19               THE COURT:  All right.
20               MR. PEARSON:  It's not the same, your Honor.
21               THE COURT:  I understand, but just as a legal
22    proposition, you're not foreclosed from seeking declaratory
23    injunctive relief.
24               MR. PEARSON:  No, not entirely.
25               THE COURT:  All right.
```

IaiWgraO

1           MR. PEARSON:  Sure.

2           THE COURT:  Let me raise the following:

3           The defendants have styled their motion as a motion

4    under 12(f).

5           Rule 23 specifically provides that the Court may enter

6    an order, 23(d)(1)(D), requiring that the pleadings be amended

7    to eliminate allegations about representation of absent persons

8    and let the action proceed accordingly.

9           Rule 16 gives the Court broad authority to formulate a

10   plan to simplify the issues, eliminate frivolous claims or

11   defenses, and adopt procedures for managing potentially

12   difficult or protracted actions that may involve complex

13   issues, multiple parties, difficult legal questions, or unusual

14   proof problems, or otherwise facilitate in other ways the just,

15   speedy and inexpensive disposition of the action.

16          I understand the plaintiff's argument that this is not

17   such a case, but in a case in which a plaintiff has had

18   discovery on numerosity and cannot make out numerosity but has

19   not had discovery on other issues, what is the proper

20   procedural vehicle for disposing of that issue up front, or is

21   it the plaintiff's position that there is no such vehicle?

22          I'll hear from the defendants first.

23          MR. BATTEN:  Thank you, your Honor.

24          It is titled a motion to strike, and you do see that

25   phrase more commonly in a motion that comes right after the

IaiWgraO

```
1    pleadings are filed, so maybe 23(d)(1)(D) is the more
2    appropriate thing here.  We didn't want to signal by invoking
3    Rule 23 that we intended this to be the plaintiffs' only shot
4    at class certification because we clearly were only addressing
5    the one point, numerosity.
6         THE COURT:  Let me make sure I'm understanding you.
7    What you're proposing is exactly that, that this is the
8    plaintiff's one and only shot at class certification.
9         MR. BATTEN:  Because they fail at the threshold, and
10   this 23(a)(1) requirement has to be satisfied before you even
11   get to the other things.
12        THE COURT:  All right.
13        MR. BATTEN:  Yes.  I don't disagree at all with what
14   your Honor said, but it may be that it's more proper, because
15   we've had some discovery and it's not the kind of motion that
16   ordinarily comes under Rule 12; it may be more appropriately
17   characterized as a 23(d)(1)(D) motion in terms of title with
18   respect to the procedure.
19        THE COURT:  All right.
20        MR. BATTEN:  If I can return, though, briefly to the
21   points my brother was just making, this is not a disparate
22   impact case.  There is no disparate impact claim in the
23   complaint, and despite several amendments, there never has been
24   one.
25             The allegation here is the disparate treatment, and
```

while there is an injunction element to the relief sought, the
real essence of the claim and the reason it's a class claim is
because they're after damages under 23(b)(3).  As your Honor
said, there is no need for a class claim in order to get
injunctive relief.

In the case law, in every case where the numerosity
standard is relaxed or numerosity is found to exist with a
smaller number of class members on the basis of injunctive
relief, it's because an injunction was the only relief sought
and the class members were vulnerable populations of welfare
recipients or the unemployed, and so forth.

This is a case that is fundamentally about damages.
It's a case in which plaintiffs want to certify a class
primarily to obtain damages for those individuals, and the
injunctive relief, respectfully, is the tail on this dog.  The
essence here is numerosity ought to be applied full throttle
here, because this is the kind of case where joinder is
entirely practicable.

Recall that the only purpose of the numerosity
requirement in the first place is, Can the plaintiffs who make
up the class be joined or not?  And this is a group of
relatively sophisticated, relatively well-paid individuals, all
of whom are either living in Manhattan or recently were living
in Manhattan, could easily be joined to this case, even if it's
59 rather than 24.

IaiWgraO

```
1          THE COURT:  You're not suggesting that Rule 23 does

2   not apply to residents of Manhattan, are you?

3          MR. BATTEN:  Certainly not.

4          THE COURT:  OK.

5          MR. BATTEN:  No, I don't begin to suggest that, but I

6   do suggest that where the number is small enough and the people

7   are located closely enough, and they have a relative degree of

8   resources and sophistication that they could join the case

9   themselves if they chose to, which nobody has chosen to do over

10  the last two years, the class treatment -- and that is the

11  adjudication of their claims without them being present in the

12  courtroom -- is not appropriate.

13         THE COURT:  Thank you.

14         MR. BATTEN:  Thank you.

15         THE COURT:  Let me hear from Mr. Pearson.

16         MR. PEARSON:  Your Honor, certainly because somebody

17  has a job that pays them high five figures or six figures

18  doesn't take them out of the protection or mean they can't

19  avail themselves of Rule 23.  You have classes of lawyers and

20  other sophisticated individuals.

21         THE COURT:  Maybe you should say lawyers and

22  sophisticated individuals.

23         MR. PEARSON:  Certainly.

24         THE COURT:  Strike the "other."

25         Go ahead.
```

1              MR. PEARSON:  So-called professionals, what have you.

2      Exactly.

3              But your Honor, with respect to the characterization

4      of the case and what it's about and what's being sought,

5      damages are being sought on behalf of the individual

6      plaintiffs.  Absolutely.  They have their own individual

7      claims.  The class claims do focus on the unlawful practices,

8      and the fact that no one has joined in the two years that the

9      action has been going, things like that, these are current

10     employees.  It does take a lot of guts.  It does take nerve.

11     It does take a lot of those things to file a lawsuit against an

12     employer, against an entity -- a powerful entity -- that you

13     work for.

14             The Times has had other lawsuits against it, including

15     a recent one that focused on race allegations along these

16     lines.  That one did not turn out to be a class-based action.

17             In addition, there have been diversity reports and

18     other things that point to stagnating, declining diversity

19     among segments of the Times's workforce.  These are broad-based

20     issues, and these are issues that would impact many people,

21     former employees, current employees, future employees.

22             THE COURT:  To pick up on one of your points, I've

23     seen quite a few securities class actions in my time, often

24     brought by a single plaintiff; a year or two can go by and not

25     another shareholder has sought to join.  I'm not familiar with

IaiWgraO

| | |
|---|---|
| 1 | case law that says that that's a reason to deny class |
| 2 | certification.  It may be an interesting observation, but I'm |
| 3 | not sure it's anything more than that. |
| 4 | MR. PEARSON:  Certainly, your Honor. |
| 5 | The fact is that where you have a civil rights matter, |
| 6 | where you have a focus on declaratory injunctive relief -- stop |
| 7 | doing this practice, find some other way to pursue it.  And it |
| 8 | doesn't need to just be the buyouts, your Honor. |
| 9 | There are other allegations that shouldn't be |
| 10 | allowed -- loss; the Court noted that at the beginning. |
| 11 | Certainly this shouldn't be only about the buyouts, and it's |
| 12 | not only about numerosity and the case law recognizes that.  In |
| 13 | cases like this one, there will be a relaxed numerosity |
| 14 | standard.  Whether it's relaxed to 35, 29, 6, that will be in |
| 15 | the Court's discretion, but there is a relaxed standard here. |
| 16 | To go back to really what I think the Court was |
| 17 | originally asking about during this portion of the proceedings, |
| 18 | the motion to strike is not the proper mechanism.  It is |
| 19 | essentially a way for defendants to say:  Great; the record is |
| 20 | where we like it; let's file our motion now and get a decision |
| 21 | now -- as opposed to after electronic discovery has finally |
| 22 | been produced, as opposed to after depositions when something |
| 23 | problematic could come out. |
| 24 | It is not the proper mechanism.  It does stand in for |
| 25 | a class certification motion.  Numerosity, obviously, is an |

IaiWgraO

```
1   important factor, and it's obviously a factor that's going to

2   come up on -- or would come up on -- class cert, so it

3   shouldn't substitute for that.  And there is case law in the

4   papers.

5             THE COURT:  How about my decision?  Wouldn't that be

6   one of the cases you would cite?

7             MR. PEARSON:  I'm sorry, your Honor?

8             THE COURT:  On the 12(b)(6).

9             MR. PEARSON:  Oh, with regard to the gender class?

10            THE COURT:  No.  With regard to striking the class

11  allegations.  There was an effort to do that at the 12(b)(6)

12  stage in this case.

13            MR. PEARSON:  Right, your Honor.  This is another bite

14  at the apple, indeed.

15            THE COURT:  I understand that, but is it your

16  position, then, that a defendant, faced with a class action,

17  has no remedy other than to complete discovery and urge the

18  court to set a prompt deadline for the plaintiff to make a

19  class certification motion?

20            MR. PEARSON:  No, not necessarily.

21            Under the cases, and the one that I suppose I would

22  point to is Reynolds v. LifeWatch, it isn't the case that

23  defendants just need to:  Hey, you're locked in; you're locked

24  into class discovery; you just have to take it and wait for

25  that motion for certification.  No, not necessarily.
```

IaiWgraO

1          Where there is an issue that is apart from the issues

2     that we raised on class cert -- right -- or where it's on the

3     face of the complaint -- right -- that there's some defect, and

4     defendants tried that once already --

5          THE COURT:  No, no, no.  You're saying if the

6     complaint doesn't state a claim for relief, then when the

7     individual plaintiffs' claims die, so die the class claims.

8          MR. PEARSON:  No, not necessarily.

9          THE COURT:  OK.

10          MR. PEARSON:  Certainly you can file a motion at the

11     outset, whether it's to dismiss or to strike, on the face of

12     the complaint.  But you can also file if there's some separate

13     issue that would make class cert impossible.  I suppose that is

14     the argument that defendants are making, that numerosity makes

15     class cert impossible.  However, plaintiffs' point is that no,

16     it does not, because numerosity is one factor.  And here,

17     although again, an important one, although the first one that

18     appears in the rule --

19          THE COURT:  This is where I may have to pull out my

20     rule book, but 23(a)(1) has necessary requirements.  It's not,

21     and know this, you're way too experienced not to know this.

22          MR. PEARSON:  Prerequisite.

23          THE COURT:  It's not something that one considers

24     along the way.  It's a prerequisite, yes.

25          MR. PEARSON:  It is.

IaiWgraO

1          THE COURT:  It's a necessity, not a "one of several

2     factors that the a court takes account of."

3          MR. PEARSON:  You certainly need more than one person,

4     right, to make a class?  But there is no strict cutoff.  The

5     case law does not say 40 people or bust.  Right?  And that

6     standard gets relaxed depending upon the circumstances of the

7     case and the relief.

8          THE COURT:  OK.

9          Listen, I think both sides have done a very fine job

10    and have been very helpful to me.  I think the arguments have

11    been presented in a reasonable, rational and understandable way

12    by both sides, and I thank you for working hard.  I know when

13    you get an order like the order I gave you, it means you have

14    to stop and really prepare to do the issue justice, and I think

15    you both have done a great job in that regard.

16         I'm going to reserve decision.

17         We are adjourned.

18         (Adjourned)

19

20

21

22

23

24

25